FILED BY HH D.C.

Oct 14, 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith                                            For rules and forms visit
Clerk of Court                                           www.ca11.uscourts.gov

October 14, 2020

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  18-13969-JJ
Case Style: USA v. De Andre Smith
District Court Docket No: 0:18-cr-60039-BB-1

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

# UNITED STATES COURT OF APPEALS
### For the Eleventh Circuit

_____

No. 18-13969

_____

District Court Docket No.
0:18-cr-60039-BB-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DE ANDRE SMITH,

Defendant - Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the judgment of this Court.

Entered: July 30, 2020
For the Court: DAVID J. SMITH, Clerk of Court
By: Djuanna H. Clark

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13969
_____

D.C. Docket No. 0:18-cr-60039-BB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DE ANDRE SMITH,

Defendant-Appellant.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 30, 2020)

Before LUCK, ED CARNES, and MARCUS, Circuit Judges.

ED CARNES, Circuit Judge:

After a six-day trial, a jury found De Andre Smith guilty of three counts of

Hobbs Act robbery, one count of carjacking, and four counts of brandishing a

firearm in furtherance of those crimes of violence.  The district court sentenced

him to 1,105 months in prison.  He raises various challenges to his convictions and

sentence, none of which succeeds.

## I.  FACTS AND PROCEDURAL BACKGROUND

Smith's convictions stem from three armed robberies and one carjacking,

crimes he committed on two days in December 2017.  We will set out only those

details of each crime that are relevant to the issues in this appeal.

### A.  <u>Smith's December 12 Robbery of Brown</u>

On December 12, 2017, Smith struck Miechelle Brown in the right eye with

a pistol, knocking her unconscious, and robbed her.  She lost her eye as a result of

Smith's assault.

At the time of the attack and robbery, Smith and Brown were not strangers.

They had met earlier that month in Fort Lauderdale, Florida.  Smith introduced

himself as "Chief" and told Brown that he was an amateur rap artist and

videographer.  She was also in the music and entertainment industry — her

business, Ill Lyricists League, Inc., provided graphic design, technical support, and

audio engineering services, including for musicians' recording sessions.  She and

Smith spoke about "the things [they] both did within the industry as independent

artists trying to make it."

When Smith and Brown met, she was on her way to a recording session at a client's studio. She invited Smith to join her. Her client was looking for someone to videotape his recording sessions for promotional footage, and Brown thought it might be a good opportunity for Smith, who seemed like he "could have benefited from a bigger network." At the client's studio Brown engineered some recording sessions, and Smith videotaped them. The sessions took a total of about four hours, during which Smith and Brown's client became Facebook friends.

Brown ran into Smith four more times during the next week. Several times, Smith told Brown that he had a virus on his computer and asked if she could help him remove it. Brown eventually agreed, and they went to a nearby apartment complex where Smith said his computer was. He met Brown at a picnic table in the courtyard of the complex with his laptop.

While Brown worked on his computer, Smith told her that he wanted a copy of Pro Tools, an expensive video editing software that Brown used in her business. Smith offered to exchange his videographer services for the software. Brown wasn't interested. She told him that she couldn't give him Pro Tools for free, that she didn't need any video footage shot, and that if she did she would use someone else. (Smith had previously shown her part of a rap video that he produced, and she thought the video was "[p]oor quality, like amateur.") Smith responded by pulling out a pistol and aiming it at her face. He again demanded Pro Tools, and

3

when Brown refused he struck her in the right eye with the pistol.  The blow to her face caused her to lose consciousness.  He took her cell phone, her wallet and cash, and a thumb drive containing software, including Pro Tools, that she used to edit video footage.

Another person in the apartment complex saw Brown stumbling around the complex and called the police, but by the time an officer arrived, Smith was gone.  Brown was taken to the emergency room, where she underwent surgery in an attempt to save her eye.  The efforts were unsuccessful, and her eye had to be removed.

Brown later learned Smith's real name when she saw him on her client's Facebook friend list.  She also identified him in a photo lineup.  And she testified at trial about the music video Smith had shown her, which the government played for the jury.

## B.  Smith's December 20 Crime Spree

Eight days after viciously attacking and robbing Brown, Smith committed a string of other violent crimes: one carjacking and two more armed robberies.  He used a firearm each time.

First, Smith committed a carjacking.  Around 9:00 p.m. on December 20, 2017, Jin Chen was standing outside the massage parlor he owned in Fort Lauderdale when Smith approached him, pointed a pistol at him, and demanded

4

Chen's wallet, cell phone, and car keys.  Chen gave Smith his wallet and car keys but said he would need to get his phone from inside the massage parlor.  Instead of waiting for the phone, Smith took Chen's car and sped off.

About half an hour later Smith robbed a donut shop.  Sharifun Nessa was working alone that night at a Dunkin' Donuts in Davie, Florida, around ten miles from Fort Lauderdale where Smith had committed the carjacking.  Smith entered the store, jumped over the counter, and threatened to kill her if she didn't give him the money in the cash register.  He pressed his pistol into her back and demanded that she open the register.  When she complied, he took the cash from it and demanded that she open a second register.  She tried, but it wouldn't open, so Smith fled.

The third violent crime Smith committed that night was at a sandwich shop.  Soon after leaving Dunkin' Donuts, he entered a Subway also located in Davie.  Repeating what he had done minutes before, Smith jumped over the counter, pointed his pistol at Alex Ralston, who was working alone, and demanded money.  Smith stood behind Ralston at the cash register, held Ralston's shirt, and demanded that he open the register.  Smith grabbed money from the register and left, telling Ralston that he would "end" him if he called the police.  Eight days later, Ralston was shown a photo lineup, and he identified Smith as the robber.

## C. Smith's Trial

On February 22, 2018, a grand jury indicted Smith on three counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951, for the robberies of Brown, Dunkin' Donuts, and Subway (Counts One, Five, and Seven); one count of carjacking, in violation of 18 U.S.C. § 2119(1), for stealing Chen's car (Count Three); and four counts of brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c), for his use of the firearm during the robberies and carjacking (Counts Two, Four, Six, and Eight).  After a six-day jury trial, he was convicted on all counts.

The district court sentenced Smith to concurrent 121-month terms on each of the Hobbs Act robbery and carjacking counts (Counts One, Three, Five, and Seven); 84 months on the first § 924(c) count (Count Two), to be served consecutively to all other counts; and 300 months on each of the other § 924(c) counts (Counts Four, Six, and Eight), also to be served consecutively to all other counts.  Each of the 300-month consecutive sentences for counts Four, Six, and Eight were imposed under § 924(c)(1)(C) & (D), which, at the time of Smith's sentencing, dictated a 25-year mandatory minimum consecutive sentence for any "second or subsequent conviction under [§ 924(c)]," § 924(c)(1)(C) (2017), including second (and third and fourth) convictions in the same prosecution.  In total, Smith was sentenced to 1,105 months (just over 92 years) in prison.

Smith raises seven challenges to his convictions and sentences.[1]

## II.  EVIDENTIARY RULINGS

Smith challenges two of the district court's evidentiary rulings: its allowance of Ralston's eyewitness identifications of Smith as the robber (both in court and out of court) and its admission of the music video of Smith's rap song, "Sauce Drippin.'"

## A.  Eyewitness Identification

The night of the robbery at the Subway restaurant, Ralston described the robber to police officers as a black man wearing a black hoodie, black shorts, and a black bandanna over his face.  He also told the police that he saw two dreadlocks poking out from under the hoodie.  Eight days later, officers showed Ralston a photo lineup consisting of Smith and five others who were chosen because they looked like Smith and matched Ralston's description of the robber.  Ralston picked out Smith's photo, identifying him as the robber with 70% certainty.  At trial, he also identified Smith as the robber.

---

[1] One of those seven challenges is, as Smith acknowledges, foreclosed by our precedent. It is his contention that his § 924(c) convictions, which are predicated on his Hobbs Act robbery and carjacking convictions, must be vacated because Hobbs Act robbery and carjacking do not qualify as crimes of violence.  We reject that argument because we have held that those crimes are crimes of violence under § 924(c)(3)'s elements clause.  See In re Saint Fleur, 824 F.3d 1337, 1341 (11th Cir. 2016) (Hobbs Act robbery); In re Smith, 829 F.3d 1276, 1280 (11th Cir. 2016) (carjacking).

Before and during trial, Smith moved to suppress evidence of Ralston's selection of Smith from the photo lineup and to prevent him from making an in-court identification of Smith as the robber. Smith argued that allowing either identification would violate his due process rights because the lineup was unduly suggestive given that he was the only person in the lineup who had two-toned dreadlocks, a distinctive physical characteristic, making Ralston's identification unreliable.

The district court held a pre-trial suppression hearing at which three witnesses testified: the crime analyst who compiled the photographs for the lineup and the two detectives who were present when Ralston was shown the lineup. In its order denying the motion to suppress, the court found that any suggestiveness resulting from Smith being the only person in the lineup with two-toned dreadlocks was "minimal," and the lineup was not unduly suggestive. The district court also reasoned that, even if the lineup was unduly suggestive, Ralston's identification of Smith as the robber "was nonetheless reliable." It found that, even though Ralston's view of Smith during the robbery was "limited," he still "had a sufficient opportunity to observe" Smith because Smith was facing Ralston as he entered the store and stood so close to Ralston that he was touching him while they were at the cash register.

We review the district court's finding that the identification procedure was not unduly suggestive only for clear error, United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001), and if we reach its reliability finding apply plenary review to that, Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988). The district court did not clearly err in finding that the lineup administered to Ralston was not unduly suggestive, so admission of Ralston's identifications of Smith did not violate due process.[2]

When suggestive lineup procedures cause an eyewitness identification to be unreliable, the identification "is constitutionally inadmissible as a matter of law." Caver v. Alabama, 537 F.2d 1333, 1335 (5th Cir. 1976).[3] For that reason, we apply a two-step analysis to determine "the constitutionality of a trial court's decision to admit out-of-court identifications." Cikora, 840 F.2d at 895. Under the two-part test we first ask whether the "original identification procedure was unduly suggestive." United States v. Brown, 441 F.3d 1330, 1350 (11th Cir. 2006). We have held that "the size of the array, the manner of its presentation, and the details

---

[2] "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). The one in this case was not.

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

of the photographs in the array" are relevant for determining whether a photo array was unduly suggestive. United States v. Perkins, 787 F.3d 1329, 1344 (11th Cir. 2015). Only if we conclude that the lineup was unduly suggestive do we need to consider "whether, under the totality of the circumstances, 'the identification was nonetheless reliable.'" Id. (quoting Diaz, 248 F.3d at 1102); accord United States v. King, 751 F.3d 1268, 1277 (11th Cir. 2014) (explaining that we will exclude an out-of-court identification only if it was unduly suggestive "and the identification did not contain sufficient indicia of reliability").

The lineup Ralston was shown contained six photographs, Smith and five others. The five other men in the photographs had all been selected because they had facial features similar to Smith's. As the district court noted, even though Smith was the only person in the lineup with dreadlocks that were two-toned, there were others in the lineup who also had dreadlocks, and one of them had dreadlocks that seemed to be more than one color. And the photographs all had similar backgrounds and were in black and white, which made the color difference in Smith's dreadlocks less obvious.

The photographic lineup was also administered in a way that was designed to minimize any potential influence on Ralston's selection: the detectives didn't control in what order or for how long Ralston viewed the photographs, and throughout the lineup they stayed quiet and tried not to indicate through their looks

10

or body language who the suspect was.  In light of these factors, the district court

did not clearly err in concluding that the lineup was not unduly suggestive.  See

Perkins, 787 F.3d at 1344 (holding that the lineup was not unduly suggestive even

though the defendant was the only man in the lineup with gold teeth); United

States v. Ricks, 817 F.2d 692, 697 (11th Cir. 1987) (same, when the defendant was

the only one in the lineup wearing glasses).[4]  Admission of Ralston's

identifications of Smith as the robber did not violate due process.

## B.  Music Video

At trial, over Smith's objection, the government played for the jury a music

video of Smith's rap song, "Sauce Drippin'," which he had posted on YouTube.

The video depicts Smith and two other men in various locations, including a

convenience store and in front of a mural.  The three men display several firearms,

and Smith displays a two-tone semiautomatic pistol.  Throughout the video Smith

is wearing a black hooded jacket, unzipped.  He is the lead artist; he raps the verses

and is in the foreground of most of the camera shots.  Brown testified at trial that

Smith had shown her the Sauce Drippin' music video as an example of his video

editing skills.  She testified that the jacket Smith was wearing in the video was the

---

[4] Because the lineup was not unduly suggestive, we need not evaluate whether Ralston's
identification of Smith was unreliable.  See Diaz, 248 F.3d at 1103 (concluding that the district
court did not err in admitting evidence of an out-of-court identification because the identification
process was not unduly suggestive).

same one he wore when he robbed her, and the pistol he carried in the video was similar to the one he struck her with.

Smith argues, as he did in the district court, that admission of the music video violated the First Amendment and Federal Rule of Evidence 403.[5]  The government argues that the video did not violate Smith's First Amendment rights because it was used to support "the charged offenses, not to malign Smith" or to criticize the views he expressed through the lyrics.  The government also argues that the video was properly admitted under Rule 403 because it was relevant to establish Smith's identity, motive, and intent, and its probative value was not substantially outweighed by the risk that it would unfairly prejudice him.

We review the district court's decision to admit Smith's music video only for an abuse of discretion.  United States v. Frank, 599 F.3d 1221, 1240 (11th Cir. 2010).  And there was none.

Admission of the video did not violate Smith's First Amendment rights.  It's true that criminal convictions may not be for expression, "however distasteful,

---

[5] In support of his position on the music video Smith also cites the standard for admission of character evidence under Rule 404(b), but he makes no argument under that rule.  For that reason, any argument that the video was improper character evidence under Rule 404(b) is not properly before us.  See United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (holding that the Rule 404(b) issue was abandoned because it was not "plainly and predominately" raised); Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

which the Constitution tolerates and protects." <u>Street v. New York</u>, 394 U.S. 576, 594 (1969). And the First Amendment prohibits introduction of "a defendant's abstract beliefs . . . when those beliefs have no bearing on the issue being tried." <u>Dawson v. Delaware</u>, 503 U.S. 159, 168 (1992). But "the evidentiary use of speech to establish the elements of a crime or to prove motive or intent" does not violate the First Amendment, and "[e]vidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 489 (1993). That is precisely what occurred here. Admission of the video did not violate the First Amendment.

Nor did its admission violate Rule 403. District courts may admit relevant evidence, which is evidence that "has <u>any</u> tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added); <u>accord</u> <u>United States v. Norton</u>, 867 F.2d 1354, 1361 (11th Cir. 1989) ("The district court possesses broad discretion to admit evidence if it has any tendency to prove or disprove a fact in issue."). Their "discretion to exclude evidence under Rule 403 is narrowly circumscribed." <u>Norton</u>, 867 F.2d at 1361. A court may exclude relevant evidence under Rule 403 only "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

"Exclusion under Rule 403 is an extraordinary remedy that should be used

sparingly." United States v. Kapordelis, 569 F.3d 1291, 1313 (11th Cir. 2009)

(quotation marks omitted).

The district court did not abuse its discretion in concluding that the music

video's probative value was not substantially outweighed by the potential for

unfair prejudice. To be sure, there was some potential for unfair prejudice. The

lyrics included Smith comparing himself to El Chapo; talking about "catch[ing] . . .

a body that's on the G"; warning, "If I pull up on you, you'll get buried," and "I

got shooters on the roof and they aim at your brain"; stating, "Ima shoot if I miss

ima shoot you again"; and bragging, "Got my . . . Ruger that shit is legit and I use

it so much when I cock it, it stick." The video glorifies violence, creating the risk

that the jury would view Smith as a violent criminal (which he is) and convict him

for that reason instead of based on the evidence at trial.

But the video also has significant probative value for the decision of

contested issues, including Smith's identity and whether he brandished a gun when

he committed the crimes. The video corroborated Brown's testimony that Smith

was an amateur rapper and videographer. It corroborated her testimony that Smith

was the man who robbed her because she identified it as the same video he had

shown her before robbing her. And it corroborated her testimony that Smith used a

14

pistol during the robbery because she identified the one in the video as similar to the pistol he struck her with.  The music video also connected Smith to the robberies at Dunkin' Donuts and Subway because the jury could compare the appearance of the pistol in the video to the one in the surveillance videos of each of those robberies.

In all, the video's potential for unfair prejudice did not substantially outweigh its probative value, and the district court did not abuse its discretion in admitting it.[6]

## III.  HOBBS ACT ROBBERY

Smith also challenges his convictions for Hobbs Act robbery of Brown (Count One) on two separate grounds.  First, he contends that the district court erred by not giving his requested jury instruction on the interstate commerce

---

[6] Smith insists that United States v. Gamory, 635 F.3d 480 (11th Cir. 2011), illustrates the inadmissibility of the video.  But the circumstances in Gamory were very different from those in this case.  Although we recognized in Gamory that the "substance of the rap video was heavily prejudicial" because the lyrics "contained violence, profanity, sex, promiscuity, and misogyny[,] and could reasonably be understood as promoting a violent and unlawful lifestyle," our holding that admission of it violated rule 403 rested on the video's lack of relevance.  Id. at 493.  We noted that: (1) the defendant was not in the video; (2) there was no evidence that he had "authored the lyrics or that the views and values reflected in the video were, in fact, adopted or shared by" him; (3) any facts the video made more probable "were not seriously contested at the time the video was introduced," so the video was cumulative; and (4) there was "little doubt that the rap video was inadmissible hearsay."  Id.  In light of those facts, the video's "minimal at best" probative value was substantially outweighed by its potential for unfair prejudice.  Id.

But the facts that led us to discount the relevance of the video in Gamory are not present in this case.  Smith was the lead rapper in the video.  His identity was at issue.  The video was not inadmissible hearsay because it consisted of Smith's own statements.  See Fed. R. Evid. 801.  And, as we discussed, the probative value of the video was far more than minimal.  Gamory does not control the outcome of this case.

element of the crime charged in that count.  Second, he contends that regardless of

the jury instruction, there was insufficient evidence to convict him of the Hobbs

Act robbery of Brown.

## A.  Jury Instruction

Before trial, Smith requested the following instruction about Count One's

interstate commerce element:

> The government does not have to prove that the defendant specifically
> intended to affect interstate commerce.  But it must prove that the
> natural consequences of the acts described would be to somehow delay,
> interrupt, or affect interstate commerce.  But as to count 1 of the
> indictment, the defendant can only be found guilty[] if the crime
> depleted the assets of an individual who was directly engaged in
> interstate commerce or the crime caused the individual to deplete the
> assets of an entity engaged in interstate commerce or the number of
> individuals victimized or the sums involved are so large that there will
> be a cumulative impact on interstate commerce.  The effect can be
> minimal.

Smith argued that because Brown, the victim of Count One, was an

individual and not a business, Count One had "a different interstate commerce

requirement" than did the other Hobbs Act robbery counts, which involved

robberies of businesses with locations nationwide.  The government objected to

Smith's proposed jury instruction, arguing that there was "no difference" between

Brown "who runs her own business and Subway and Dunkin' Donuts."  The

government also argued that Smith's proposed instruction would "completely

confuse the jury" and was not "an accurate statement of what the government

needs to prove." The district court denied Smith's request and instead instructed the jury:

> The Government does not have to prove that the Defendant specifically intended to affect interstate commerce. But it must prove that the natural consequences of the acts described in the indictment would be to somehow delay, interrupt, or affect interstate commerce. If you decide that there would be any effect at all on interstate commerce, then that is enough to satisfy this element. The effect can be minimal.

We review a district court's refusal to give a requested jury instruction only for an abuse of discretion. United States v. Roberts, 308 F.3d 1147, 1153 (11th Cir. 2002). The refusal to give a requested instruction justifies reversal and a new trial only if "(1) the requested instruction was substantively correct, (2) the court's charge to the jury did not cover the gist of the instruction, and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." United States v. Rutgerson, 822 F.3d 1223, 1236 (11th Cir. 2016) (quotation marks omitted). Smith's requested instruction on the interstate commerce element of Hobbs Act robbery was not substantively correct, so the district court did not abuse its discretion in declining to give it.

Smith's argument relies primarily on United States v. Diaz, 248 F.3d 1065 (11th Cir. 2001). In that case, a jury found multiple defendants guilty of numerous crimes, including conspiracies and attempts to violate the Hobbs Act and several substantive Hobbs Act violations. Id. at 1081–82. For each crime, the defendants

argued on appeal that the government had failed to prove the requisite effect on

interstate commerce.  Id. at 1087.

We explained in Diaz several ways the interstate commerce element can be

proven when a defendant is prosecuted for Hobbs Act robbery of an individual:

> While the Hobbs Act usually is applied to robberies of
> businesses, criminal acts directed toward individuals also may violate
> the Hobbs Act.  Robberies or extortions perpetrated upon individuals
> are prosecutable under the Hobbs Act when any one of the following
> three conditions are met: (1) the crime depletes the assets of an
> individual who is directly engaged in interstate commerce; (2) the crime
> causes the individual to deplete the assets of an entity engaged in
> interstate commerce; or (3) the number of individuals victimized or the
> sums involved are so large that there will be a cumulative impact on
> interstate commerce.

Id. at 1084–85.  Applying that test, we affirmed the defendants' Hobbs Act

convictions in Diaz.  We focused on the individual victims' close ties to businesses

engaged in interstate commerce and the effect the Hobbs Act crimes had on those

businesses.  Id. at 1088.  We emphasized that the evidence established that the

defendants had targeted the victims because of their ties to the interstate

businesses.  Id. at 1089.  Taken together, that was enough to show that the Hobbs

Act crimes affected interstate commerce.  Id. at 1088–92.

Smith argues that his proposed instruction was correct because it "tracked

the language in Diaz."  He is wrong about that; his requested instruction did not

track the language in Diaz.  Instead, it changed Diaz's meaning by inserting the

word "only" before the three illustrative circumstances Diaz listed as examples of

ways a defendant can be convicted of a Hobbs Act violation against an individual.

As the previous quote from it shows, <u>Diaz</u> introduces the list of three

circumstances with the phrase, "Robberies or extortions perpetrated upon

individuals are prosecutable under the Hobbs Act <u>when any one of the following</u>

<u>three conditions are met</u>."  248 F.3d at 1084–85 (emphasis added).  Smith's

proposed jury instruction introduced the three circumstances with the phrase, "But

as to count 1 of the indictment, the defendant <u>can only be found guilty</u>" if one of

those three conditions is met.  That turned <u>Diaz</u>'s non-exhaustive list into an

exhaustive one.  And this Court has already rejected that reading — not once, but

twice.

  In <u>United States v. Carcione</u>, we rejected the argument that "because

Appellant robbed an individual, not a business, the government was <u>required</u> to

prove one of the three elements" from <u>Diaz</u>.  272 F.3d 1297, 1301 n.6 (11th Cir.

2001) (emphasis added).  We noted that although the <u>Diaz</u> factors provided "an

effective barometer for measuring a defendant's actions and their effect on

interstate commerce, we have repeatedly held that in determining whether there is

a minimal effect on commerce, each case must be decided on its own facts."  <u>Id.</u>

(quotation marks omitted).  And we restated that interpretation four years later in

<u>United States v. Verbitskaya</u>, in which we looked to the <u>Diaz</u> factors "as a

guideline," but reiterated that we had "not expressly adopted" them as a restrictive

19

test.  406 F.3d 1324, 1332 (11th Cir. 2005).  Instead, we again clarified that "we

have continued to stress a fact-specific inquiry into the directness and likely extent

of any impact on interstate commerce."  Id. at 1332 n.10.

Which is to say that Diaz identified three circumstances, any one of which is

sufficient to prove an effect on interstate commerce, though some other

circumstance under a different set of facts might also be sufficient.  Smith's

proposed jury instruction, by contrast, stated that one of the three circumstances

from Diaz is necessary to prove an effect on interstate commerce.  For that reason,

Smith's proposed jury instruction was not substantively correct, and the district

court did not abuse its discretion in refusing to give it.

## B.  Sufficiency of the Evidence

Smith also contends that there was insufficient evidence for the jury to

conclude that his robbery of Brown affected interstate commerce.  That contention,

like all of the other ones we have discussed, fails.

We review de novo a "challenge to the sufficiency of the evidence

concerning whether a robbery had a sufficient effect on interstate commerce to

support a conviction under the Hobbs Act."  United States v. Le, 256 F.3d 1229,

1232 (11th Cir. 2001), superseded in non-relevant part by U.S.S.G. Amendment

599.  In doing so, we view the evidence in the light most favorable to the

government and draw all reasonable inferences in favor of the verdict.  United

States v. Godwin, 765 F.3d 1306, 1319 (11th Cir. 2014).  We will affirm a

conviction if "any reasonable construction of the evidence" would have allowed

the jury to find Smith guilty beyond a reasonable doubt.  United States v.

Castleberry, 116 F.3d 1384, 1388 (11th Cir. 1997) (quotations omitted).

    The interstate commerce element of Hobbs Act robbery is expansive.  It

covers robberies that "in any way or degree obstruct[], delay[], or affect[]

commerce or the movement of any article or commodity in commerce."  18 U.S.C.

§ 1951(a).  The Supreme Court has made it clear that the interstate commerce

element should be interpreted in light of the Hobbs Act's sweeping language:

"[The] Act speaks in broad language, manifesting a purpose to use all the

constitutional power Congress has to punish interference with interstate commerce

by extortion, robbery or physical violence."  Stirone v. United States, 361 U.S.

212, 215 (1960).

    A "Hobbs Act violation requires an actual effect on interstate commerce,"

Diaz, 248 F.3d at 1084, but the effect need not be substantial, and even a "minimal

impact" on interstate commerce is enough to support a Hobbs Act conviction,

United States v. Kaplan, 171 F.3d 1351, 1354 (11th Cir. 1999) (en banc); accord

United States v. Guerra, 164 F.3d 1358, 1361 (11th Cir. 1999) ("[A]n individual

defendant's conduct need not substantially affect commerce precisely because the

Hobbs Act regulates general conduct — robberies and extortion — which in the

aggregate affects commerce substantially."). Consistent with the Hobbs Act's broad sweep, we have held that "[a] mere 'depletion of assets' of a business engaged in interstate commerce will meet the requirement." United States v. Rodriguez, 218 F.3d 1243, 1244 (11th Cir. 2000) (quoting Guerra, 164 F.3d at 1360).[7]

Because the jury could reasonably have concluded that Smith's robbery of Brown depleted the assets of a business engaged in interstate commerce, there was sufficient evidence to prove the interstate commerce element of a Hobbs Act violation. First, the evidence was sufficient for the jury to conclude that Brown's business, Ill Lyricists League, Inc., was engaged in interstate commerce. She testified that some of the products she used in her business came from other states or from other countries. That is enough to establish that her business was engaged in interstate commerce. See Le, 256 F.3d at 1231, 1236 (concluding that a Florida business was directly engaged in interstate commerce because it purchased supplies from Georgia); see also Diaz, 248 F.3d at 1088 (concluding that a

---

[7] In the concluding paragraph of his argument addressing the sufficiency of the evidence, Smith asserts that "there was NO proof of a substantial effect on interstate commerce." To the extent he argues that a Hobbs Act robbery conviction requires a showing of a substantial effect on interstate commerce, we have squarely rejected that argument. See United States v. Castleberry, 116 F.3d 1384, 1388 (11th Cir. 1997) ("We have already determined as a matter of law that the impact on commerce does not need to be substantial; all that is required is minimal impact.").

business was engaged in interstate commerce in part because it purchased products from out of state).

Second, the government presented evidence that, even though Smith robbed Brown, an individual, he robbed her of items she used for her business. Brown testified that Smith took her thumb drive, her cell phone, her wallet, and cash. And Brown testified that the thumb drive contained software she regularly used in her business, including Pro Tools software, a Pro Tools plug-in, and her "personal iLock license." She stated that the Pro Tools software cost $500, and the Pro Tools license cost $1,300. The jury could reasonably conclude from this evidence that robbing Brown of her thumb drive depleted the assets of her business, which was engaged in interstate commerce. That meets the Hobbs Act's requirement of an effect on interstate commerce. See Rodriguez, 218 F.3d at 1244 ("A mere 'depletion of assets' of a business engaged in interstate commerce will meet the requirement.") (quoting Guerra, 164 F.3d at 1360).

Smith nonetheless argues that the evidence was insufficient to convict him of Hobbs Act robbery because Brown "was an individual who unfortunately was attacked and robbed," but "[t]here was NO commercial aspect" to her relationship with Smith, and "it was a simple robbery." But there is no requirement that the criminal and victim have a commercial relationship to satisfy the Hobbs Act's requirement of an effect on interstate commerce.

23

Our precedent dictates that a defendant commits a Hobbs Act crime when he extorts or robs an individual and that extortion or robbery affects a business engaged in interstate commerce, regardless of whether the criminal and victim have a commercial relationship, a personal relationship, or no relationship at all. For example, in <u>Diaz</u> the defendants extorted a large sum of cash from a stranger. 248 F.3d at 1091.  Despite the defendants' lack of any relationship with their victim, we upheld their Hobbs Act convictions because the cash was receipts from his gas station, which was engaged in interstate commerce.  <u>Id.</u>

In this case Smith robbed Brown, someone he knew personally, but that is not what matters under the Hobbs Act.  What matters is that his robbery of Brown affected interstate commerce because he took the thumb drive containing software she used in her business, which was engaged in interstate commerce.  The evidence was sufficient for the jury to convict Smith of Hobbs Act robbery of Brown.[8]

---

[8] The government also argues that it proved the requisite effect on interstate commerce because "the time Brown spent in the hospital and recovering from surgery following Smith's assault was time that she could have spent operating her business."  <u>Cf.</u> <u>Diaz</u>, 248 F.3d at 1088 (relying in part on the facts that the victims "were forced to close [their business] for several days," which meant that "seven to ten patients could not be seen, which was unusual," and that "billings decreased and less work was accomplished" to support a finding that the Hobbs Act violation affected interstate commerce).  We need not address that argument because of our holding that the evidence was sufficient to hold that Smith's robbery of Brown depleted the assets of a business engaged in interstate commerce.

## IV.  THE FIRST STEP ACT

Smith was convicted of four § 924(c) counts — Counts Two, Four, Six, and Eight.  He was sentenced on September 13, 2018.  At that time, § 924(c)(1)(C) required district courts to impose a 25-year mandatory minimum consecutive sentence for any "second or subsequent conviction under [§ 924(c)]." § 924(c)(1)(C) (2017).  The Supreme Court had interpreted the 25-year mandatory minimum as applying to second (and third, and fourth, and so on) § 924(c) convictions within a single prosecution.  See Deal v. United States, 508 U.S. 129, 131–32 (1993).  As a result, Smith received three 25-year mandatory minimum consecutive sentences for the Count Four, Six, and Eight convictions.

On December 21, 2018, just a little more than three months after Smith was sentenced, the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, was signed into law by the President.  It went into effect on that date.  Section § 403 of the Act amended § 924(c)(1)(C) so that the 25-year mandatory minimum consecutive sentence required by that statute does not apply to multiple § 924(c) convictions, like Smith's, resulting from a single prosecution.  Instead, under the First Step Act amendments, the mandatory minimum consecutive sentences for second or subsequent § 924(c) convictions apply only where the later conviction is for a § 924(c) violation that occurs after a previous one has become final.

Smith contends that the First Step Act applies retroactively to his offenses.
First, he argues that § 403(a) merely clarified, but did not change, § 924(c)(1)(C).
And because his convictions are on direct appeal, he argues that he is entitled to
the benefit of that clarification.  Second, he argues that when § 403(b) speaks of a
sentence being "imposed," it is referring to when a sentence becomes final, not
when the sentence is announced by the district court.  Because his convictions are
on direct appeal, according to Smith, they are not final and have not been
"imposed" within the meaning of the Act.  Finally, he argues that to the extent
there is any ambiguity about this in § 403, the rule of lenity entitles him to the
benefit of the amendments.

The government argues that the First Step Act did not clarify but changed
§ 924(c), and that the plain language of § 403(b) of the Act limits the benefit of the
changes to § 924(c) to defendants whose sentences were imposed after the date of
the Act's enactment.  According to the government, § 403 does not apply to Smith
because his sentences were "imposed" by the district court when it sentenced him
on September 13, 2018 — which was before December 21, 2018, the Act's
enactment date.

Section 403 of the Act, titled "Clarification of Section 924(c) of Title 18,
United States Code," states in full:

(a) IN GENERAL. — Section 924(c)(1)(C) of title 18, United States
    Code, is amended, in the matter preceding clause (i), by striking

"second or subsequent conviction under this subsection" and inserting "violation of this subsection that occurs after a prior conviction under this subsection has become final."

(b) APPLICABILITY TO PENDING CASES. — This section, and the amendments made by this section, shall apply to any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not <u>been imposed</u> as of such date of enactment.

§ 403, 132 Stat. at 5221–22 (emphasis added).

Smith's argument that § 403 simply "clarified" § 924(c), entitling him to the Act's benefit, is based in part on § 403's title: "Clarification of Section 924(c)." § 403, 132 Stat. at 5221.  The general rule is that when an amendment "clarifies prior law rather than changing it, no concerns about retroactive application arise and the amendment is applied to the present proceeding as an accurate restatement of prior law." <u>Piamba Cortes v. Am. Airlines, Inc.</u>, 177 F.3d 1272, 1283 (11th Cir. 1999); <u>see</u> <u>Fiore v. White</u>, 531 U.S. 225, 228 (stating that there was "no issue of retroactivity" when a state supreme court case "merely clarified" the state's law, because the clarification "was not new law").

But this argument ignores "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text."  <u>Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.</u>, 331 U.S. 519, 528–29 (1947).  "[T]his Court has held repeatedly that section headings may only be used to interpret a statute when the statute is ambiguous." <u>Essex Ins. Co. v. Zota</u>, 466 F.3d 981, 989–90 (11th Cir. 2006) ("[W]hen we are dealing with federal law, the heading or title of a

statute cannot trump the plain meaning of the text."); accord United States v.

Ferreira, 275 F.3d 1020, 1029 (11th Cir. 2001) ("[W]e have held that the title of a

statutory provision may be useful only when it sheds light on some ambiguous

word or phrase."); Scarborough v. Office of Pers. Mgmt., 723 F.2d 801, 811 (11th

Cir. 1984) ("[R]eliance upon headings to determine the meaning of a statute is not

a favored method of statutory construction.  Section headings cannot limit the plain

meaning of the text and may be utilized to interpret a statute, if at all, only where

the statute is ambiguous.").

There is no ambiguity in § 403(b).  It plainly draws a line based on the Act's

enactment date and provides that whether the amendments in § 403(a) apply to a

case depends on which side of that line the imposition of the sentence falls.  We

follow "the wise rule that the title of a statute and the heading of a section cannot

limit the plain meaning of the text," a rule that has been consistently adhered to

since it was laid down by the Supreme Court more than seven decades ago.  Bhd.

of R.R. Trainmen, 331 U.S. at 528–29.

Anticipating that holding, Smith also argues that a sentence is "imposed"

within the meaning of § 403(b) on the date it becomes final following any appeal

(which in his case has not yet happened), not when the district court pronounces

the sentence.  For support, Smith points out that a conviction is final when "a

judgment of conviction has been rendered, the availability of appeal exhausted, and

the time for a petition for certiorari elapsed or a petition for certiorari finally decided." Griffith v. Kentucky, 479 U.S. 314, 321 n.6 (1987). Smith's argument would be a winner if § 403(b) stated that the amendments apply to offenses in which the defendant's "conviction became final" after the enactment date, or maybe (only maybe) if it stated that the amendments applied to cases in which the "conviction" occurred after the enactment date. But that is not what the statute says. We have recognized repeatedly that courts have no authority to amend, improve, or remodel statutes. See, e.g., T-Mobile S., LLC v. City of Milton, 728 F.3d 1274, 1284 (11th Cir. 2013) ("We are interpreting a statute, not designing one. . . . Our duty is to say what statutory language means, not what it should mean, and not what it would mean if we had drafted it."); Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) ("Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve' statutes by altering them."); Harris v. Garner, 216 F.3d 970, 976 (11th Cir. 2000) (en banc) ("We will not do to the statutory language what Congress did not do with it, because the role of the judicial branch is to apply statutory language, not to rewrite it."). And neither do litigants.

Falling back onto the plain language of § 403(b), the key question is when during the proceedings is a sentence imposed. Our precedent dictates that a sentence is "imposed," somewhat unsurprisingly, when the district court imposes

it.  In United States v. Pelaez, 196 F.3d 1203, 1205 (11th Cir. 1999), we addressed the applicability of a newly enacted sentencing provision in 18 U.S.C. § 3553(f) that applied to "all sentences imposed on or after" a certain date.  The defendant in Pelaez argued there, as Smith does here, that the provision applied to him, even though he was sentenced by the district court before that provision's effective date, because "a sentence is not imposed until the sentence is affirmed by the Court of Appeals on direct appeal."  Id.  We rejected that argument, holding instead that "a sentence is imposed when the district court enters the final judgment."  Id.; cf. Fed. R. Crim. P. 35(c) ("As used in this rule, 'sentencing' means the oral announcement of the sentence."); United States v. Morrison, 204 F.3d 1091, 1093–94 (11th Cir. 2000) (holding that "when the sentence in a case is orally imposed," not when the written judgment is entered, is the relevant date for determining when the district court loses jurisdiction to correct a sentence under Rule 35).

In holding that a sentence is "imposed" for purposes of § 403(b) when it is pronounced in the district court, we join the other circuits that have decided the issue.  See United States v. Voris, 964 F.3d 864, ---, 2020 WL 3737168, at *9 (9th Cir. July 7, 2020) ("[Section] 403 of the First Step Act does not apply to cases pending on appeal in which the district court sentenced the defendant before the enactment of the First Step Act."); United States v. Gomez, 960 F.3d 173, 178 (5th Cir. 2020) ("The date that matters in the § 403 inquiry is when the district court

imposed the defendant's sentence — not when the defendant exhausted his appeals."); <u>United States v. Cruz-Rivera</u>, 954 F.3d 410 (1st Cir. 2020) (holding that § 403 of the First Step Act does not apply to defendants sentenced after the Act's effective date, even if their cases were pending on direct appeal at that time); <u>United States v. Jordan</u>, 952 F.3d 160, 163, 171–74 (4th Cir. 2020) (holding that "§ 403 of the First Step Act does not apply retroactively to cases pending on direct appeal when it was enacted"); <u>United States v. Richardson</u>, 948 F.3d 733, 748–53 (6th Cir. 2020) (holding that a sentence is imposed for purposes of § 403 when it is announced by the district court, not when it becomes final); <u>see also</u> <u>United States v. Hodge</u>, 948 F.3d 160, 163 (3d Cir. 2020) (rejecting the defendant's argument that the district court should have applied the First Step Act when resentencing him after a limited remand because "the First Step Act conditions the reduced mandatory minimum's retroactive application on the imposition of <u>a</u> sentence — not <u>the</u> sentence, an <u>ultimate</u> sentence, or a <u>final</u> sentence"); <u>cf.</u> <u>United States v. Brown</u>, 935 F.3d 43, 45 n.1 (2d Cir. 2019) (stating that § 403 "provides no benefit to Brown in the pending appeal at this point," but that "at the resentencing, which will occur as a result of our remand, Brown will have the opportunity to argue that he is nevertheless entitled to benefit" from the Act).[9]

---

[9] And for what it is worth, one other circuit has reached the same conclusion we do in an unpublished opinion.  See <u>United States v. Hunt</u>, 793 F. App'x 764, 767 (10th Cir. 2019) ("The

Two other arguments that Smith puts forward barely merit mentioning.  He says that we ought to apply the § 403(a) amendments to his case because an appellate court must "apply the law in effect at the time it renders its decision, unless . . . there is statutory direction or legislative history to the contrary." Bradley v. Sch. Bd. of City of Richmond, 416 U.S. 696, 711 (1974).  As we have explained, there is "statutory direction . . . to the contrary" in § 403(b).  And because there is no ambiguity in that statutory direction, his rule of lenity argument is also beside the point.  See United States v. Camacho-Ibarquen, 410 F.3d 1307, 1315 (11th Cir. 2005) ("We will apply the rule of lenity only if the provision being construed is still ambiguous after application of normal rules of construction.").

Section 403 of the First Step Act does not apply to Smith's offenses, and as a result § 924(c)(1)(C) required the district court to impose consecutive 25-year minimum sentences for Smith's convictions on Counts Four, Six, and Eight.

## V.  OTHER SENTENCE ISSUES

Smith also challenges his 1,105-month sentence on two other grounds, neither of which succeeds.

---

language of § 403 of the First Step Act plainly does not reach § 924(c)(1)(C) sentences like Hunt's, which were imposed before the Act was enacted.").

A.  <u>Eighth Amendment</u>

Smith first argues that his 1,105-month sentence violates the Eighth

Amendment because it is disproportionate in light of his crime and his individual

characteristics.  The Eighth Amendment prohibits the infliction of "cruel and

unusual punishments."  U.S. Const. Amend. VIII.  It does contain "a narrow

proportionality principle that applies to noncapital sentences," <u>Ewing v.</u>

<u>California</u>, 538 U.S. 11, 20 (2003) (quotation marks omitted), but it "does not

require strict proportionality between crime and sentence," <u>Harmelin v. Michigan</u>,

501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the

judgment).  Outside the context of capital punishment, successful challenges to the

proportionality of sentences are rare.  <u>United States v. Johnson</u>, 451 F.3d 1239,

1242 (11th Cir. 2006).  The reason for their rarity is that "the fixing of prison terms

for specific crimes involves a substantive penological judgment that, as a general

matter, is properly within the province of legislatures, not courts." <u>Harmelin</u>, 501

U.S. at 998 (opinion of Kennedy, J.) (quotation marks omitted).

We have upheld against Eighth Amendment challenges similar sentences for

similarly severe crimes.  And both the Supreme Court and this Court have upheld

against Eighth Amendment challenges longer sentences for less severe crimes.

In <u>United States v. Davis</u>, 754 F.3d 1205 (11th Cir.), <u>vacated by</u> 573 F.

App'x 925 (11th Cir. 2014) (en banc), <u>and reinstated in relevant part by</u> 785 F.3d

498, 500 (11th Cir. 2015) (en banc), we held that a 1,944-month sentence for a defendant who "was eighteen and nineteen years old at the time of the commission of the offenses, . . . suffered from bipolar disorder and a severe learning disability, and had no prior convictions" did not violate the Eighth Amendment.  Id. at 1221.  Davis, like Smith, was convicted of multiple counts of Hobbs Act robbery and multiple associated counts of using, carrying, and possessing a firearm in furtherance of a crime of violence.[10]  Id. at 1209.

We rejected Davis' argument that his sentence was "grossly disproportionate when considering his youth, intellectual disability, and emotional maturity, and . . . especially harsh for a non-homicide offense."  Id. at 1221.  While acknowledging that his sentence was "unmistakably severe," we noted:  His "crimes were numerous and serious.  Multiple victims experienced being robbed and threatened with a handgun.  Davis's use of a handgun entailed a risk of severe injury or death."  Id. at 1221–22.  We could not and did not conclude "that such repeated disregard for the law and for victims should overcome Congress's determination of what constitutes an appropriate sentence, even when Eighth Amendment concerns are implicated."  Id. at 1222.

---

[10] Davis was convicted of two counts of conspiracy to violate the Hobbs Act, seven counts of Hobbs Act robbery, and seven counts of using, carrying, and possessing a firearm in furtherance of a crime of violence.  United States v. Davis, 754 F.3d 1205, 1209–10 (11th Cir.), vacated by 573 F. App'x 925 (11th Cir.2014) (en banc), and reinstated in relevant part by 785 F.3d 498, 500 (11th Cir. 2015) (en banc).

The same is true in this case.  Although Smith's sentence, like Davis', was "unmistakably severe," it does not violate the Eighth Amendment.  Id. at 1221.  Smith robbed four people and threatened each of them with a pistol.  He struck one of his victims so violently with the pistol that she lost her eye.  Davis' use of a firearm "entailed a risk [of] severe injury or death."  Id. at 1222.  Smith's use of a firearm actually resulted in a severe injury.  Congress, in § 924(c), expressed its judgment that even the risk of such an injury should carry a severe penalty.  Cf. id.  Smith's 1,105-month sentence does not violate the Eighth Amendment.  Cf. Harmelin, 501 U.S. at 1005 (opinion of Kennedy, J.) (sentence of life in prison without parole for possessing 672 grams of cocaine not unconstitutionally disproportionate); United States v. Bowers, 811 F.3d 412, 432–33 (11th Cir. 2016) (182-year sentence for committing eight robberies while brandishing a firearm not unconstitutionally disproportionate); United States v. Clark, 634 F.3d 874, 875, 877–78 (6th Cir. 2011) (189-year sentence for seven armed robberies not unconstitutionally disproportionate).

Our conclusion is supported by the fact that Smith's sentence is below the statutory maximum for each of his crimes of conviction.  See United States v. Moriarty, 429 F.3d 1012, 1024 (11th Cir. 2005) ("In general, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment.") (quotation marks omitted).  The statutory maximum penalty

35

for Hobbs Act robbery (Counts One, Five, and Seven) is 20 years in prison.  See 18

U.S.C. § 1951(a).  For carjacking (Count Three), the statutory maximum penalty is

15 years.  See 18 U.S.C. § 2119(1).  And the statutory maximum penalty for

§ 924(c) violations (Counts Two, Four, Six, and Eight) is life imprisonment.  See

§ 924(c)(1)(A).  Smith's sentences of 121 months (10 years and 1 month) for

Counts One, Three, Five, and Seven are well below both Hobbs Act robbery's

maximum penalty of 20 years and carjacking's maximum penalty of 15 years.

And Smith's sentences of 7 years for Count Two and 25 years each for Counts

Four, Six, and Eight are all also well below § 924(c)'s maximum penalty of life in

prison.[11]

### B.  Substantive Unreasonableness

Smith argues in the alternative that even if his sentence does not violate the

Eighth Amendment, it is substantively unreasonable.  It isn't.

We review the substantive reasonableness of a sentence only for abuse of

discretion.  United States v. Irey, 612 F.3d 1160, 1188–89 (11th Cir. 2010) (en

banc).  "A district court abuses its discretion when it (1) fails to afford

---

[11] Nor does the mandatory nature of Smith's consecutive sentences for his § 924(c) convictions render his sentence unconstitutional.  "There can be no serious contention . . . that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.'" Harmelin v. Michigan, 501 U.S. 957, 995 (1991).  Smith's 1,105-month sentence is not unconstitutionally disproportionate, and it does not become so simply because it was largely the result of consecutive mandatory minimum sentences.

consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." Id. at 1189 (quotation marks omitted).

The district court did not abuse its discretion in sentencing Smith to a total of 1,105 months in prison for three robberies, a carjacking, and four § 924(c) offenses.  Of that total, 984 months resulted from the mandatory minimum consecutive sentences on Counts Two, Four, Six, and Eight that were required by § 924(c), and doing what a statute requires is not an abuse of discretion.  Cf. Young v. New Process Steel, LP, 419 F.3d 1201, 1203 (11th Cir. 2005) ("[A] ruling based on an error of law is an abuse of discretion.").

Nor did the district court abuse its discretion in imposing an additional 121 months on Counts One, Three, Five, and Seven.  At the sentence hearing the court heard statements from one of Smith's victims, Miechelle Brown.  She told the court how she was "reminded of" the robbery every day and suffers depression as a result.  She also explained to the court that she "sincerely was trying to help" Smith when he robbed her and knocked her unconscious with his pistol, a blow so hard that it caused her to lose one of her eyes.  The court also heard from Smith's mother, who said that Smith was not the kind of person he had been made to seem, that he "always used to do good for people," and that after the death of his brother

(about ten years earlier) he was never the same.  That was in addition to the information that was in the PSR about Smith's background, which the court considered.

The court discussed the facts of Smith's four crimes, which it added were "all terrifying events."  It noted that the robberies of the two fast food restaurants were captured on surveillance video and "[t]he jury and all of us in the courtroom saw exactly what transpired, and we could all put ourselves in the shoes of those terrified victims."  The court also referred to Smith's criminal history and acknowledged that it had considered all of the 18 U.S.C. § 3553(a) factors.  The district court did not give weight to any improper or irrelevant factor, fail to give weight to a proper factor, make a clear error of judgment in weighing the factors, or otherwise abuse its discretion.

As we have discussed, see supra p. 36, Smith's sentence, although lengthy, was below the statutory maximums for his crimes.  See United States v. Dougherty, 754 F.3d 1353, 1362 (11th Cir. 2014) ("A sentence imposed well below the statutory maximum penalty is an indicator of a reasonable sentence."). It was not substantively unreasonable.  See Irey, 612 F.3d at 1189.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 30, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 18-13969-JJ
Case Style: USA v. De Andre Smith
District Court Docket No: 0:18-cr-60039-BB-1

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF")
system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF
system by registering for an account at www.pacer.gov. Information and training materials related to
electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today
in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later
date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for
rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate
filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the
time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content
of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list
of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-
1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition
for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time
spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of
a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404)
335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the
signature block below. For all other questions, please call Tiffany A. Tucker, JJ at (404)335-6193.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13969
_____

ERRATA


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DE ANDRE SMITH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 30, 2020)

Before LUCK, ED CARNES, and MARCUS, Circuit Judges.

ED CARNES, Circuit Judge:

PAGE 3: Edit the following sentences –

- "While Brown worked on his computer, Smith told her that he wanted a copy of Pro Tools, expensive video" by inserting the word "an" before "expensive" so that it reads:
    - While Brown worked on his computer, Smith told her that he wanted a copy of Pro Tools, <mark>an</mark> expensive video . . .
- "She told him that she couldn't give him Pro Tools for free, and that she didn't need any video footage shot, and if she did, she would use someone else." By deleting the first "and", adding the word "that" after the second "and," and deleting the final comma, so that it reads:
    - "She told him that she couldn't give him Pro Tools for free, that she didn't need any video footage shot, and that if she did she would use someone else."

On page 4 –

- Delete the comma after refused so that "when Brown refused, he struck" becomes "when Brown refused he struck"